Helen R. King v. Commissioner.
King v. Commissioner
Docket No. 108419.
United States Tax Court
1944 Tax Ct. Memo LEXIS 404; 3 T.C.M. (CCH) 11; T.C.M. (RIA) 44004; January 4, 1944
*404 Estates and trusts: Net income: Estate in process of administration. - Commissioner's determination that the executors unduly prolonged the administration of the estate so that the estate would not be recognized as a taxable entity during 1939 is reversed upon the evidence, and taxpayer, as beneficiary, is not held liable for tax on the net income of the estate. Harry C. Howard, Esq., 301 Kal. Nat. Bank Bldg., Kalamazoo, Mich., for the petitioner. Philip M. Clark, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in income tax for the year 1939 in the amount of $12,206.64. Respondent concedes that petitioner is entitled to an adjustment in connection with one of the issues. The only question is whether petitioner is taxable on income of an estate which is still in process of administration, which income was not distributed to petitioner in the taxable year. Petitioner denies that there is any deficiency and claims that tax has been overpaid. Petitioner filed an income tax return for the taxable year with the collector for the district of Michigan. Findings of Fact Petitioner is the widow of Merrill *405 B. King who died testate in March of 1933. She resides in Kalamazoo, Michigan. The will of the decedent was admitted to probate in the Probate Court of Kalamazoo County, Michigan, and petitioner and Harry C. Howard are the duly appointed and acting executors of the estate, having been appointed April 14, 1933. The estate is still under administration. The Probate Court has not discharged the executors and ordered distribution of the estate. The chief asset of the estate is 12,362 shares of capital stock of the Rex Paper Company, a Michigan corporation, of which the decedent was the general manager and the sole stockholder, with the exception of two or three holders of qualifying shares of stock. The decedent, Merrill B. King, died owing approximately $126,837. The assets of his estate were appraised by appraisal commissioners appointed by the Probate Court at a total value of $458,512, of which the stock in the Rex Paper Company was appraised at $35 a share, or $432,693. The assets consisted of small lots of stock in various corporations, other than Rex Paper Company stock, and certain personal property. There was very little cash in the estate. Among the debts of decedent was an *406 indebtedness to Rex Paper Company in the amount of $75,910. The decedent, in his will, directed that all of his debts and estate taxes should be paid out of the corpus of the estate as soon as practicable after his decease. He also authorized his executors, while in possession of the estate, and the trustees of the trust, to pledge or hypothecate all or any portion of the estate property for any new or existing indebtedness of the estate, and the executors and trustees are given wide power to retain or sell the estate property, to borrow money, to give notes, etc. The executors were in need of obtaining funds to satisfy claims against the estate and to pay taxes. They borrowed funds from Rex Paper Company and gave notes. With the borrowed funds the executors paid the Federal estate tax of about $40,000 and the claims of all creditors excepting Rex Paper Company. The executors borrowed approximately $114,275 from the Rex Paper Company, so that the total amount owed to that company at the end of 1934 was $190,185.65. The Rex Paper Company was the only source for borrowing funds at the time. Banks were having difficulties and there was no market for selling the stock in the Rex Paper *407 Company at the time. Among the claims against the estate was a claim of Alropa Corporation which was litigated in the Circuit Court of Michigan. The litigation continued until 1937 and a Federal income tax growing out of that case was paid in January 1938. At the beginning of 1939, the indebtedness of the estate to Rex Paper Company had been reduced to the amount of $183,951.78. One of the legatees of the decedent had not yet received full payment on a legacy of $10,000. The unpaid amount of the legacy was $6,000. At the beginning of 1939, a testamentary trust under the will had not yet been set up and the trustees had not yet been appointed. During 1939, an assessment on the estate was made by Kalamazoo Bancshares, Inc. in the amount of $146.09 on 300 shares of Bancshares, Inc., which was held by the executors. The executors paid the assessment. At the beginning of 1939, all of the debts of the estate had been paid excepting the indebtedness to Rex Paper Company. The State and Federal inheritance taxes had been paid. Under the will of the decedent the residuary estate was to be held in trust and the trustees were directed to pay in convenient installments, preferably monthly, *408 to decedent's wife, petitioner, the net income from the residue of the estate after satisfying charges against the estate. The will named petitioner as the joint executrix and the joint trustee under the will. During the year 1939, the Rex Paper Company declared a dividend of $25,000. This was not paid to the executors, directly, but was credited on the books of the Paper Company against the indebtedness of the estate, reducing the indebtedness to $158,951.78. The executors of the estate filed a fiduciary income tax return for the year 1939 which reported gross income of $55,627.17, which included the dividend of $25,000 mentioned above. The net income of the estate, as adjusted by the Commissioner, was $53,626.95. The executors distributed to petitioner, as a beneficiary, $22,318.04, deducting that amount from the net income of the estate in the income tax return. The estate paid income tax on net income of approximately $31,000. Petitioner included the amount she received from the estate in her individual income tax return. The Commissioner, in determining the deficiency, held that petitioner was taxable on the full amount of the net income of the estate and, accordingly, increased *409 petitioner's taxable income by the amount of $31,308.91. Petitioner is president and general manager of Rex Paper Company. For the year 1939, she received a salary from Rex in the amount of $22,308. The parties have stipulated that a loss in the amount of $800 was sustained by petitioner during the taxable year and that amount should be allowed as a deduction from gross income. Opinion The question is whether the taxable year constitutes a period of administration or settlement of decedent's estate under section 161 (a) (3) of the Internal Revenue Code. The estate was still being administered by the executors during the taxable year. Respondent contends that the administration of the estate was unnecessarily prolonged and that the circumstances are such that the estate should not be recognized in the taxable year as a separate taxpayer under the statute. Respondent has not recognized the estate as a separate taxpayer and has taxed all of the net income to petitioner. Prior to 1935, the executors had paid all of the State and Federal inheritance taxes and all of the claims of creditors against the estate, with the exception of the claim of the Rex Paper Company. During 1939, there *410 was a substantial indebtedness to Rex for amounts borrowed by the estate during the period of administration and for an indebtedness of the decedent. The executors had the problem of either selling the Rex stock, or applying dividends on the stock to the indebtedness to Rex. They did not sell the stock and there is some evidence to the effect that there was no market for the stock. The situation was such that it may be assumed that the executors believed it unwise to sell the Rex stock, in any event, because such sale would have reduced the amount of the residuary estate to a considerably smaller value and would have reduced the trust income to which petitioner was entitled for life under the will. The retention of the Rex stock was obviously preferable in order to preserve the estate property for the benefit of the decedent's surviving family, consisting of petitioner and children. The executors had a difficult problem. The question is whether, under all of the circumstances, they had unduly prolonged the administration of the estate during 1939 instead of winding it up in 1938 or 1939, under some arrangement with the remaining creditor and the legatee who still was to receive $6,000 *411 of the bequest. It was not until the end of 1937 that litigation over one claim against the estate was concluded, and a payment in connection with that litigation was made by the estate in January 1938. The question is difficult because petitioner is one of the executors of the estate, she will become one of the trustees of the testamentary trust, and she is the president of the remaining creditor, the Rex Paper Company. Under the will, petitioner is entitled to receive only the income from the residuary estate which is to be held in trust. There is a question whether she would be entitled to any income of the trust until the unpaid legacy and indebtedness are paid in full out of either property or income therefrom. During 1939, petitioner was not entitled to any family allowance from the executors of the estate under the law of Michigan, which provides that a family allowance shall be paid only during the first year of the administration of an estate. Petitioner was not without income. Her income from sources other than the estate during the taxable year was approximately $25,600, most of which consisted of salary paid to her by Rex. The decision of the executors to distribute to *412 her $22,318 out of dividends paid on the Rex stock during the taxable year was, perhaps, subject to question. The record does not disclose whether or not the executors have ever made an accounting to the Probate Court. The evidence shows that the Rex Paper Company sustained losses in 1933, 1934, and 1935. In 1933 and 1934, the Rex Paper Company paid dividends in the amounts of $3,724.98 and $14,900.04. In 1935, 1936, and 1937, the Rex Paper Company paid dividends of $15,000 in each year; dividends were paid in 1938 and 1939 in the amounts of $30,000 and $54,900. Thus, from 1933 through 1939 the total dividends paid by Rex Paper Company were $148,525.02. The record does not clearly show how the estate used the dividends received on the Rex stock during the years prior to 1939. The indebtedness to Rex at the end of 1934 was $190,185.65. If the total dividends on Rex stock had been available exclusively for payment on the debt to Rex, which the record does not show, and had been applied to the estate's indebtedness to Rex during the years 1933 through 1939, the indebtedness would have been reduced from $190,185.65 to $41,660.63 at the end of 1939. Under the above facts, can it be said *413 that the executors have unduly prolonged the administration of the estate so that the estate should not be recognized as a taxable entity during 1939? We think that this question must be answered in the negative. Perhaps the executors have not been diligent or meticulous in their administration of the estate because of their failure to apply all of the income of the estate which was available during the period prior to 1939 to the debt to Rex and to the balance of the bequest to one legatee. However that may be, even if the executors have not been scrupulously correct in their treatment of the estate income, and assuming arguendo that they have not been, that is not determinative of the issue presented, because even if the executors had applied the full amount of the dividends on the Rex stock to the indebtedness owed to Rex during the period there would still have been an unpaid balance of debt of the estate to Rex at the end of 1939. Respondent stresses the fact that in the first instance the decedent directed the executors to pay all debts and expenses of the estate out of the estate's corpus. However, elsewhere in the will, the executors were authorized to manage the estate *414 property in the same manner as the decedent would do, if living, to retain all of the property, to borrow money, and to hypothecate all of the property of the estate for any new or existing indebtedness. The decedent gave the executors wide discretion in the matter of selling or retaining the estate property. It cannot be said that the executors have gone contra to the terms of the will in retaining the Rex stock or in borrowing money to pay the existing indebtedness of the estate. The practical reasons for retaining the Rex stock are obvious. Another circumstance to which respondent attaches some weight in his brief is that the Rex Paper Company received the proceeds of a life insurance policy on decedent's life in the amount of $325,000. This fact was brought out by respondent on cross-examination of one witness. Respondent argues that the proceeds of the insurance could have been used by Rex Paper Company to discharge the indebtedness of the estate to Rex, or to settle all of decedent's debts. The record suggests that Rex Paper Company was the beneficiary of the policy. It does not show whether or not the Company had paid the premiums on the policy, and if so, the total amount *415 of the premiums paid. We think respondent should have brought into the record by questions in cross-examination all of the facts on this point. He could have done so because the witness was a vice president of Rex and had with him the books of the company. It can be presumed that Rex Paper Company had taken out the policy on the life of the decedent and had paid the premiums. If that is true, then the proceeds of the policy must have been a return of capital to Rex, to some extent at least. We cannot say that the Rex Paper Company had any right or duty to apply any or all of the insurance proceeds to pay decedent's debts or the particular debt of the estate to Rex. Also, we cannot say that the executors of the estate should have worked out some arrangement with Rex so that the estate's debts would have been satisfied by some such use of the insurance proceeds as respondent has suggested. In short, in deciding the question before us, we are unable to attach any weight to the circumstance that Rex received the insurance proceeds. The facts do not support the conclusion that the failure to close the estate prior to the taxable year was "so unnecessary as to be merely capricious and *416 the estate a mere form - a subterfuge for spreading taxes out thinner." J. H. Anderson, 30 B.T.A. 1275, 1277. Cf. Walter A. Frederich, 2 T.C. 936. The respondent's determination is reversed. Dicision will be entered under Rule 50.